NOTICE
Decision filed 12/24/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240803-U

NO. 5-24-0803

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 99-CF-148 |
| | ) | |
| STEVEN M. CRUTCHFIELD, | ) | Honorable |
| | ) | Michelle M. Schafer, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The order of the circuit court dismissing the defendant's second amended petition for postconviction relief is affirmed.

¶ 2     The defendant appeals the June 19, 2023, order dismissing his second amended postconviction petition after a third-stage evidentiary hearing. The defendant claims that his constitutional rights were violated where the circuit court sentenced the defendant to natural life in prison without considering evidence of the defendant's rehabilitation potential. The defendant additionally argues that trial counsel and appellate counsel provided ineffective assistance of counsel. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      The defendant, Steven M. Crutchfield, born December 22, 1968, married Tracie Teffertiller in May of 1998. In March of 1999, Tracie was considering divorcing the defendant and spent time with her friend, Michael Sasso. The defendant believed that Tracie was having an affair, and he beat Tracie with the buckle end of a belt and tried to smother her with a pillow. Tracie reported the incident to the police and applied for an order of protection. The defendant then attempted suicide and received inpatient psychiatric treatment. Tracie separated from the defendant after his suicide attempt. The defendant moved into an apartment while Tracie remained in their marital home.

¶ 5      In April of 1999, Sasso visited Tracie's home. After Sasso arrived, the defendant shoved the front door open, ripping the chain mechanism off the door frame. He entered Tracie's home and had a knife and a screwdriver. Tracie attempted to call 911, but the phone had no dial tone as the defendant had disconnected the phone line. The defendant killed Sasso by repeatedly stabbing him with a knife in front of Tracie and Tracie's young daughter from a prior marriage.

¶ 6      The defendant was originally charged with first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1) (West 1996)). The defendant was found guilty of first degree murder but mentally ill. This court reversed the defendant's conviction and remanded for a new trial because the circuit court had erred in refusing to instruct the jury with the defendant's tendered second degree murder instruction. *People v. Crutchfield*, No. 5-00-0004 (2001) (unpublished order under Illinois Supreme Court Rule 23).

¶ 7      Upon remand, the defendant was again convicted of first degree murder on September 3, 2002, after a jury trial. The jury additionally found that "the evidence established beyond a

reasonable doubt that the death of Michael Sasso was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 8 According to the presentence investigation report (PSI), the defendant did not have a prior criminal history. He was honorably discharged from the United States Air Force in October of 1991, and he was last employed as a phlebotomist and an autopsy assistant at the Veterans Administration Hospital in Marion, Illinois. The defendant reported that he had trouble controlling his anger in the past and suffered from depression due to marital problems but claimed that he had not had any issues with his anger since his incarceration at Menard Correctional Center (Menard). The defendant reported that he had attended one psychological counseling session at Menard and was told further counseling was not necessary. The defendant and a fellow inmate started a prison ministry at Menard in August of 2000, and the PSI included attachments which reflected that the defendant had achieved religious certificates.

¶ 9 During the sentencing hearing, five witnesses were called by the defendant to offer evidence in mitigation and in support of the defendant's request for a lenient sentence. The State recommended natural life without parole and argued that the murder was premeditated, as the defendant had cut the telephone line to the home and had parked down the street to avoid being seen. The State further described the killing of Sasso as a "brutal slaughter of an unarmed, defenseless young man" as the victim had over 30 stab wounds.

¶ 10 Defense counsel requested a sentence of 20 years and argued that the defendant would be able to achieve rehabilitation. The circuit court was asked to consider the defendant's entire life and except for "one dark moment" the defendant's life still had "light," "shine," and "purpose." The defendant argued that he lacked a prior criminal history, his family believed that there was

3

"goodness" in the defendant, and he was an honorably discharged military veteran who worked for the Veterans' Administration and aspired to become a doctor.

¶ 11    The circuit court considered the PSI, the defendant's written statement, the financial impact of incarceration, evidence and information offered by the parties in aggravation and mitigation, arguments by the parties, and a victim impact statement. The circuit court referenced the statutory factors in mitigation and aggravation, noting one factor in aggravation, the necessity to deter others, and one factor in mitigation, the lack of criminal history.

¶ 12    An extended term from 60 years to 100 years or natural life imprisonment was considered by the circuit court because the jury found that the defendant's conduct was brutal and heinous and indicative of wanton cruelty. The circuit court agreed with the jury's finding. The circuit court found that "[t]he evidence showed to the jury and to the Court as well that this was a cold-blooded, premeditated crime. [Defendant] selected the knife, the screwdriver to disconnect the phone line— the phone wires. The Court does not believe that this was a heat-of-passion killing." The victim was stabbed multiple times and the defendant continued stabbing while the victim was begging for the defendant to stop.

¶ 13    The circuit court acknowledged that the defendant's family cared about the defendant, and considered that the defendant did not have a criminal history, and found that,

> "those facts are dwarfed by the premeditated, horrific crime which [the defendant] committed and the fact that I am convinced based on the evidence that [the defendant is] a danger to the public. [The defendant] would be a danger to the public if [he] were ever released and would commit further acts of violence."

The defendant was sentenced to natural life in prison without the possibility of parole on October 29, 2002. The defendant subsequently filed a motion reconsider his sentence and an amended motion to reconsider his sentence. The defendant included an argument in the amended motion to

4

reconsider his sentence that the circuit court failed to consider his rehabilitative potential. The circuit court denied the defendant's motion to reconsider.

¶ 14   On his direct appeal from the second conviction, the defendant argued that he was denied a fair trial because he was required to wear a stun belt during the trial and his trial counsel was ineffective in failing to object to that requirement. This court rejected the defendant's claims and affirmed his conviction and sentence. *People v. Crutchfield*, 353 Ill. App. 3d 1014 (2004). The factual basis for the defendant's conviction is set forth in his prior appeals. Therefore, we have only reiterated those events necessary for the disposition of this appeal.

¶ 15   On August 7, 2007, the defendant filed a *pro se* petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2006)). The petition was delayed for nine years, caused in part by two motions to substitute the trial judge, and a motion to review the files of his trial counsel. In that regard, the defendant filed a motion to compel production of the files, which was denied by the circuit court. This court, by summary order, required the release of the files, after the State conceded error. Additionally, the delay was also occasioned by the fact there were multiple postconviction attorneys appointed to represent the defendant. Five attorneys were appointed, over the years, to assist the defendant with his postconviction petition. All of them were allowed to withdraw, without ever filing an amended postconviction petition on behalf of the defendant. Finally, the defendant filed a motion for leave to proceed *pro se.* In his motion, the defendant described the nine years of delay, with five appointed counsel, none of whom had made any "efforts to amend or supplement the original *pro se* petition." The defendant claimed he was forced to proceed *pro se* but requested the appointment of "shadow counsel to assist throughout the remainder of the proceedings." The

5

circuit court granted the defendant's request to proceed *pro se* on August 26, 2016, but denied the appointment of "shadow counsel."

¶ 16 On October 7, 2016, the defendant filed an amended *pro se* postconviction petition and supporting memorandum, making a number of claims. The State filed a motion to dismiss the defendant's petition on March 31, 2017. On September 19, 2017, the circuit court granted the State's motion by docket entry, stating simply that, "After review and consideration, the State[']s motion to dismiss the amended petition for post-conviction relief is granted. Copy to defendant and State." The defendant appealed the second-stage dismissal of his petition for postconviction relief. On appeal, he raised the issue of having to wear a stun belt during trial, the failure of the trial judge to give a tendered non-IPI instruction, the jury's verdict was against the manifest weight of the evidence, and he was denied effective assistance of appellate counsel for failure to raise these issues on appeal. The defendant also argued that the circuit court erred in refusing to grant his motion to compel production of his trial counsel's files. This court found that the circuit court erred in failing to grant the defendant's motion for access to his trial counsel's files and remanded for further second-stage proceedings. *People v. Crutchfield*, No. 5-17-0366 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 17 On October 18, 2022, the defendant filed an amended petition for postconviction relief, by his attorney. On November 2, 2022, the State filed its motion to dismiss the defendant's amended postconviction petition. Thereafter, the circuit court granted the State's motion to dismiss but gave leave to the defendant to file a second amended petition for postconviction relief. The defendant's counsel filed the second amended petition on June 20, 2023. The State filed a motion to dismiss the second amended petition on July 25, 2023. The circuit court considered the State's motion, and on September 21, 2023, issued a ruling. The circuit court's order granted the State's motion to

6

dismiss as it related to all ineffective assistance of counsel claims, finding the second prong of *Strickland*[1] had not been met; denied the defendant's claim related to the stun belt, finding it barred by *res judicata* from a prior appeal; and dismissed all of the remaining allegations as having no merit, except for the defendant's claim that the circuit court failed to properly and adequately consider the defendant's rehabilitative potential at sentencing. As to this latter claim, the circuit court set a third-stage evidentiary hearing to determine whether the trial court "failed to adequately balance the proportionate penalty clause of the Illinois Constitution" when it sentenced the defendant to life in prison without parole.

¶ 18 On January 18, 2024, the circuit court held a third-stage hearing on the issue of whether the circuit court had fully considered the defendant's rehabilitative potential at the time of the sentencing hearing. The defendant, as well as family, friends, fellow inmates, and correctional officers, testified that the defendant has been rehabilitated and should be released into society. The State argued against the relevancy of any testimony regarding the defendant's behavior after his sentencing hearing and objected to the relevancy of witness testimony throughout the hearing. The circuit court noted the State's continuing objection but allowed the defendant to present witness testimony.

¶ 19 The defendant testified that he was first incarcerated on April 4, 1999. He did not have a criminal history before his incarceration, except for an arrest for domestic violence which was dismissed, *nolle prosequi*. The defendant worked as a lab technician and was studying to become a medical doctor. Since his incarceration, he has never been disciplined, and his record was clear of any negative marks. The defendant earned multiple degrees while incarcerated, including a doctorate degree in theology, as well as a doctorate in Christian Counseling, with a Christian

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

7

Counseling therapy certification. He has worked many jobs while incarcerated, and the defendant described the jobs as "the highest category that you can be cleared for to work." The defendant believed that the circuit court had not considered that he had been incarcerated for approximately 2.5 to 3 years at the time of his sentencing hearing, and that the defendant's "adjustment to incarceration was never brought to light at that point in time."

¶ 20 The defendant's brother, Allen Crutchfield, testified that he was the defendant's younger brother. Allen was a college student when the defendant was initially incarcerated. He believed that the defendant was capable of being rehabilitated. Allen had never witnessed the defendant appear angry enough to injure anyone, and the defendant had never been that upset towards any prior friends or girlfriend.

¶ 21 Shane Grregson stated that his recent job title was Correctional Counselor 2. Grregson's job duties included the screening of individuals in custody for jobs, and he supervised behavioral programs. Grregson had known the defendant since 2011, and he supervised the defendant when the defendant worked as a clerk in the law library. Grregson indicated that he would have no issue with the defendant being released back into society.

¶ 22 Jason Vasquez, a re-entry counselor at Menard, testified that he has known the defendant since 2002. The State objected to the relevancy of the witness's testimony. The circuit court "reluctantly overrule[d]" the objection and allowed Vasquez to testify even though he met the defendant after the defendant had been sentenced. Vasquez stated that he did not believe that the defendant would pose a safety threat if released.

¶ 23 Donald Forcum, a fellow inmate at Menard convicted of murder, indicated that he had known the defendant for over 20 years. Forcum had never seen the defendant attempt to manipulate

other inmates or staff members. The defendant was a helpful person, and he assisted inmates improve the quality of their life.

¶ 24    James Coulter, an inmate at Menard serving natural life for homicide, testified he had known the defendant since 2018. The defendant would visit inmates in their cells and help everyone with their needs, such as hobbies or court proceedings. The defendant helped Coulter become a peer educator.

¶ 25    Glen Williams, another inmate at Menard convicted of first degree murder, stated that he became friends with the defendant in 2017 or 2018. The defendant inspired Williams to become a teacher's aide and to be helpful to others. The defendant helped William's wife with a security deposit on her home so she could move closer and visit more often.

¶ 26    Chris Mathis, a retired employee from the Illinois Department of Corrections (IDOC) since 2020, testified that he first met the defendant in 2010. Mathis was the defendant's supervisor for seven and a half years. In the 28 years that Mathis worked for the IDOC, he believed that the defendant was his best worker. Mathis testified that he would not have an issue with having the defendant as his neighbor if the defendant were released. Mathis stated, "There is only maybe two incarcerated individuals of thousands that I've worked with that I would say this about, he would be welcome at my house for dinner on a regular basis."

¶ 27    Donna Inanen indicated that she had visited Menard through prison ministry, and that she was never an inmate. Inanen met the defendant through a mutual friend in 2010. Inanen co-owns an apartment which she promised to rent to the defendant after his release from prison.

¶ 28    Allen Buckner testified that he met the defendant in 2001 when they were both inmates at Menard. Buckner and the defendant developed a program called the "Mending Broken Wings Ministry" in an attempt to bring inmates hope through the Bible.

¶ 29   The circuit court allowed the defendant to file a report from an expert witness, Jonathan Minkus, assistant state's attorney in Cook County, who was unavailable on the day of the evidentiary hearing. Minkus drafted a letter dated March 13, 2024, which provided his professional opinion on the merits of the defendant's case. Minkus opined that "it was plain error and significant ineffective assistance of counsel for failure to raise the profound constitutional issues of the defendant's capacity for rehabilitation in violation of the rehabilitation clause of the Illinois constitution and the Eighth Amendment to the United States Constitution." Minkus further opined that the defendant was capable of being restored to useful citizenship based on his lack of criminal history, education, employment. The defendant's behavior since he was incarcerated was evidence that the defendant's constitutional rights were violated at sentencing.

¶ 30   The State filed a written objection to the defendant offering any testimony from Minkus, including his letter and any proposed deposition of Minkus. The State argued that Minkus should not be considered an expert witness. The State noted that the circuit court had previously dismissed all issues related to ineffective assistance of counsel. Minkus's testimony, according to the State, was irrelevant and offered no probative value, and the letter submitted was not an affidavit or a report. Rather, it was a summary of expected testimony. The defendant later characterized the letter as a proffer of testimony by Minkus. The State did not object to the proffer. Minkus never testified.

¶ 31   The circuit court entered a formal written order on June 26, 2024, denying the defendant's second amended postconviction petition. The circuit court considered the testimony elicited during the third-stage hearing, trial transcripts, the prior sentencing hearing transcript, and the PSI, along with the attachments. The circuit court noted that at the end of the defendant's jury trial, the jury returned a separate verdict form finding that the "death of Michael Sasso was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty." The written order also

10

included that the sentencing court had considered the murder to be a "premeditated, horrific crime." The defendant had been found to be a "danger to the public" and if he were released, the sentencing court considered that the defendant "would commit further acts of violence."

¶ 32    In the written order dismissing the second amended postconviction petition, the circuit court explained that the defendant had essentially requested the circuit court to consider the extent to which the defendant had been rehabilitated after sentencing. The circuit court found that the sentencing court had considered the necessary factors in mitigation and aggravation, and the PSI, which provided a detailed biographical, educational, and criminal history of the defendant. The sentencing court was unable to consider the extent to which the defendant, currently, had been rehabilitated. The circuit court found that "Post Judgment actions reflecting proof of subsequent rehabilitation cannot be considered by the Court in this Third Stage Hearing." Furthermore, the sentencing court had rendered its decision based on the facts and circumstances available to it at the time.

¶ 33    The circuit court additionally considered that the defendant's sentence was quite substantial but concluded it was not "so disproportionate to the offense as to shock the moral sense of community." The evidence submitted during the third-stage postconviction hearing that was relevant to the proportionate penalties clause was insufficient to set aside the 2002 sentencing decision. The defendant's sentence of natural life without the possibility of parole remained in full force and effect, as the circuit court denied the defendant's second amended postconviction petition after the evidentiary hearing. This appeal followed.

¶ 34                                   II. ANALYSIS

¶ 35    On appeal, the defendant argues that the circuit court erred in sentencing the defendant to life in prison and improperly rejected evidence of rehabilitation, that the circuit court erred in

11

denying postconviction relief where the circuit court failed to consider that the defendant had been fully and completely rehabilitated, and that the circuit court failed to address the defendant's equal protection argument. The defendant additionally raises ineffective assistance of counsel claims against his trial counsel and his appellate counsel for failing to adequately address these sentencing issues.

¶ 36     The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a three-step process to resolve a criminal defendant's conviction or sentence that resulted from a violation of rights protected under the state or federal constitution. *People v. York*, 2016 IL App (5th) 130579, ¶ 15. "At the first stage of postconviction proceedings, the court reviews the petition to determine whether it is frivolous and patently without merit." *York*, 2016 IL App (5th) 130579, ¶ 15. The defendant must make a "substantial showing of a constitutional violation" at the second stage. (Internal quotation marks omitted.) *York*, 2016 IL App (5th) 130579, ¶ 16. Then, if the petition advances to the third stage, the court will hold an evidentiary hearing on the defendant's claims. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 27. The petitioner has the burden to show a substantial denial of a constitutional right by a preponderance of the evidence during the third stage. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 37     After an evidentiary hearing, where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. Manifest error is "clearly evident, plain, and indisputable" (internal quotation marks omitted), and a "decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98.

¶ 38     The eighth amendment prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. Inherent in the prohibition of cruel and unusual punishment is the concept of proportionality.

*Graham v. Florida*, 560 U.S. 48, 59 (2010). A criminal sentence must be "graduated and proportioned to both the offender and the offense." *People v. Davis*, 2014 IL 115595, ¶ 18.

¶ 39    The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To be meritorious on a claim of a proportionate penalties clause violation, "a defendant must show either that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community; or that it differs from the penalty imposed for an offense containing the same elements." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). The Illinois Constitution additionally provides that, "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2.

¶ 40    "The spirit and purpose of the law are promoted when the trial court's sentence reflects both the seriousness of the offense and gives sufficient consideration to the defendant's rehabilitative potential." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28. While the circuit court must consider the defendant's rehabilitative potential and any mitigating factors that are present, it is not required to give those factors more weight than it gives aggravating factors. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. Rather, the seriousness of the offense is one of the most important factors for the sentencing court to consider. *Etherton*, 2017 IL App (5th) 140427, ¶ 28.

¶ 41    A circuit court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Substantial deference is given to the circuit court's sentencing decision because the sentencing judge "is in a much better position to consider factors such as the defendant's credibility,

13

demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court may reduce a sentence if the trial court abused its discretion but cannot overturn a sentencing court's decision because it considers the factors differently. *People v. Jones*, 2015 IL App (1st) 142597, ¶ 39.

¶ 42    The defendant argues that the circuit court improperly rejected evidence of rehabilitation in deciding the merits of the second amended postconviction petition and that the sentencing court in 2002 erred in finding permanent incorrigibility. The defendant further claims he was denied the opportunity to introduce evidence of rehabilitation in violation of his equal protection rights. The defendant's reliance on *People v. Guerrero*, 2022 IL App (1st) 210400, is misplaced. In *Guerrero*, the defendant, who was 22 when he committed a gang-related murder, filed a postconviction petition that was denied at the first stage. *Guerrero*, 2022 IL App (1st) 210400, ¶¶ 22, 23. In his petition, Guerrero alleged that his 45-year sentence was unconstitutional under the eighth amendment (U.S. Const., amend. VIII) and that he should be compared to a juvenile, based upon the research regarding emerging adults. *Guerrero*, 2022 IL App (1st) 210400, ¶¶ 8, 20. The *Guerrero* court acknowledged that before sentencing a juvenile to life imprisonment, the circuit court must determine whether the defendant's " 'conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *Guerrero*, 2022 IL App (1st) 210400, ¶ 34 (quoting *People v. Holman*, 2017 IL 120655, ¶ 46). After examining the postconviction petition, the *Guerrero* court found that the claim was meritless, as the defendant was not a juvenile at the time of the offense and there was nothing in the record "to support the notion that defendant's actual mental age was younger than his chronological age." *Guerrero*, 2022 IL App (1st) 210400, ¶ 34. Therefore, the defendant had not demonstrated that he was not permanently incorrigible. *Guerrero*, 2022 IL App (1st) 210400, ¶ 34. This reasoning does

14

not apply to the defendant herein, who was clearly an adult when he committed first degree murder, and *Holman* has been overruled. See *People v. Wilson*, 2023 IL 127666, ¶ 42. Under *Wilson*, juveniles can be sentenced to life in prison without a separate finding of incorrigibility. *Wilson*, 2023 IL 127666, ¶ 42.

¶ 43    The defendant also argues that we should consider the statute on resentencing (730 ILCS 5/5-5-4(a) (West 2024)) and the statute on causes for discharge when in custody (735 ILCS 5/10-124 (West 2024)) when considering the merits of the defendant's postconviction petition. The defendant's sentence has not been set aside, and the issue of what matters should be considered in a resentencing hearing is not an issue on appeal. The defendant also acknowledges that he is not seeking a discharge. These statutes are not applicable in this case.

¶ 44    The sentencing court in 2002 considered trial evidence, the PSI, the defendant's written statement, evidence and argument in aggravation and mitigation as offered by the parties, the victim impact statement, and the financial impact of incarceration. After considering the information and arguments presented, the circuit court agreed with the jury's finding that the defendant's conduct was brutal, heinous, and indicative of wanton cruelty. The circuit court found that the evidence showed "a cold-blooded, premeditated crime." We note that the defendant does not argue that an extended prison sentence was unwarranted, given the seriousness of the crime.

¶ 45    The sentencing court acknowledged the defendant's family support and that he had no criminal history. Prior to the 2002 sentencing hearing, the sentencing court was also aware of the defendant's involvement in prison ministry and that the defendant had earned religious certificates while incarcerated. According to the sentencing court, those facts in the defendant's favor were found to be "dwarfed by the premeditated, horrific crime," and the defendant was considered a

15

"danger to the public." The sentencing court did not abuse its discretion by imposing a natural life sentence.

¶ 46    The evidence offered during the third-stage postconviction evidentiary hearing in 2024, did not demonstrate that the sentencing court had erred in 2002. Rather, the defendant presented a series of witnesses who became acquainted with the defendant after he was sentenced to demonstrate that the defendant had been rehabilitated. The defendant posits that the evidence of his behavior postsentencing demonstrates that the sentencing court reached the incorrect conclusion in 2002 regarding the defendant's rehabilitative potential. We disagree.

¶ 47    No new evidence that would have been available at the time of the sentencing was presented during the third-stage evidentiary hearing. The sentencing court had clearly recognized the seriousness of the offense as one of the most important factors to consider where the mitigating factors were "dwarfed by the premeditated, horrific crime which [the defendant] committed." The defendant's rehabilitative potential was adequately considered at that time when the circuit court found that the defendant would be a "danger to the public" if he "were ever released," and that the defendant would commit further acts of violence. After the third-stage evidentiary hearing, the circuit court considered the information and arguments presented to the sentencing court and determined that the defendant had not demonstrated that his constitutional rights were violated. We find that the circuit court did not err by dismissing the defendant's second amended postconviction petition where the defendant did not show a substantial denial of a constitutional right by a preponderance of the evidence.

¶ 48    The defendant additionally argues that his trial counsel and appellate counsel on direct appeal provided ineffective assistance of counsel where neither raised any constitutional issues regarding the defendant's sentence to natural life. Claims of ineffective assistance of counsel are

16

governed by a two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44. Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness. *People v. Veach*, 2017 IL 120649, ¶ 30. "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). We apply *de novo* review to the defendant's ineffective assistance of counsel claims. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 49 The defendant's natural life sentence was appropriate based on the seriousness of the offense committed and where the circuit court considered mitigating factors and the defendant's rehabilitative potential. Therefore, the defendant has not demonstrated that the performances by trial counsel or appellate counsel were deficient or that he was prejudiced by their deficient performance.

¶ 50                                III. CONCLUSION

¶ 51 For the forgoing reasons, we affirm the judgment of the circuit court of Williamson County.

¶ 52 Affirmed.

17